CHERRYDALE HEATING & AIR CON-
DITIONING and TIC Insurance
Company, Petitioners,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent.

Howard Poole, Intervenor.

Gabrielle Evans, Petitioner,

v.

District of Columbia Department
of Employment Services,
Respondent.

Debevoise & Plimpton and INA/CIGNA
Insurance Company, Intervenors.

No. 96–AA–1512, 97–AA–1364.

District of Columbia Court of Appeals.

Argued Nov. 12, 1998.

Decided Dec. 24, 1998.

William S. Hopkins for petitioner in No.
96–AA–1512.

Peter J. Vangsnes, Washington, DC, for
petitioner in No. 97–AA–1364 and intervenor
in No. 96–AA–1512.

Stephen P. Zachary, Washington, DC, for
intervenors in No. 97–AA–1364.

Mark L. Schaffer, Washington, DC, filed a
brief for intervenor in No. 96–AA–1512.

Jo Anne Robinson, Principal Deputy Cor-
poration Counsel, and Charles L. Reischel,
Deputy Corporation Counsel, filed a state-
ment in lieu of brief for respondent.

Before TERRY, FARRELL, and REID,
Associate Judges.

FARRELL, Associate Judge.

On these consolidated petitions for review, we must decide whether the Director of the Department of Employment Services ("DOES") erred in awarding (in No. 96–AA–1512) and denying (in No. 97–AA–1364) further temporary total disability benefits to a claimant who had previously received a schedule payment for a permanent partial disability. *See* D.C.Code § 36–308(3) (1997). Petitioner in each case ("Cherrydale Heating" in No. 96–AA–1512, "Evans" in No. 97–AA–1364) contends that the Director's two decisions cannot be reconciled with each other or with this court's decision in *Smith v. District of Columbia Dep't of Employment Servs.*, 548 A.2d 95 (D.C.1988). In *Smith*, we upheld the Director's interpretation of the Workers' Compensation Act ("the Act")[1] as generally barring an award of further temporary total disability benefits to a recipient of a schedule payment for a permanent partial disability stemming from the same injury. *See id.* at 102.

▉▉▉ We hold that the decisions reviewed here are not inconsistent, and that each rests, as did the Director's decision in *Smith*, upon a reasonable interpretation of the governing statute: specifically, that the amputation undergone by claimant Poole (No. 96–AA–1512) justifies a narrow departure from the general prohibition recognized in *Smith*, but that the lesser change of condition experienced by claimant Evans (No. 97–AA–1364) does not. We therefore affirm both decisions.

## I.  The Facts

### A.  No. 96–AA–1512

Howard Poole suffered injuries to his left great toe while at work on September 1, 1985, when he was struck on the foot by a piece of falling sheet metal. He received medical and surgical treatment, and subsequently filed for benefits under the Act. In a Compensation Order of August 4, 1988, Poole was awarded temporary total disability benefits from September 1, 1985 through February 4, 1986. When he thereafter reached maximum medical improvement, he received

a schedule award for a 10% permanent partial disability of the left great toe.

In September 1988, Poole's treating physician determined that his condition had worsened, and in November 1988 amputated a large portion of the affected toe. Poole therefore sought renewed temporary total disability benefits from September 30, 1988 and continuing, but did not request an increased permanent partial disability rating based on the amputation.

A DOES hearing examiner denied the application on the basis of our decision in *Smith, supra*. The Director, however, reversed and remanded after distinguishing *Smith* as follows:

> The claimant in *Smith* suffered a mere flare-up of her injury, whereas in this case the claimant had to undergo surgery to amputate a further portion of his toe. Even though employer argues that this distinction is without merit, the claimant, herein, after his surgery would need some time to be once again at the stage of maximum medical improvement. Therefore, claimant is entitled to receive wage loss benefits, if he cannot work, until he can be rated again for his schedule injury.

### B.  No. 97–AA–1364

Eileen Gabrielle Evans, then a legal secretary, tripped and fell at work on April 29, 1987, sustaining injuries to her left wrist and both knees. She received temporary total and then temporary partial disability benefits from May 2 through September 8, 1987. In a 1989 stipulation Evans, her employer, and the employer's insurer agreed that, having reached maximum medical improvement, she was entitled to schedule benefits for permanent partial disability as follows: 15% for the left hand, 16% for the right leg, and 18% for the left leg.

After the stipulation, Evans returned to work but continued having difficulty with her left hand and knee. She underwent separate surgeries for these problems in late 1990 and early 1991, and was again unable to work. She requested temporary total disability ben-

---

1. D.C.Code § 36–301 *et seq.* (1997).

efits for the period from October 15, 1990, through April 7, 1991, contending that, unlike the claimant in *Smith, supra,* who had experienced merely a "flare-up" of her condition that came and went, Evans' condition had worsened to the point of requiring surgery. A hearing examiner rejected this distinction, ruling that although Evans had "experienced a deterioration to the condition of her hand and left knee," *Smith* nonetheless barred an award of further temporary disability benefits for the same injury. The Director affirmed, "agree[ing] with the Hearing Examiner's conclusion that since claimant reached maximum medical improvement and received a schedule award ... for permanent partial disability under D.C.Code § 36–308(3), she is not entitled to temporary total disability benefits for future wage loss arising out of the same injury," citing *Smith.*

## II. Discussion

Petitioners contend that the Director's decisions here either conflict with or misapply our decision in *Smith.* Petitioner Evans further argues that the denial of temporary total disability benefits to her cannot be squared with the award of similar benefits to claimant Poole. We begin by explaining exactly what this court held in *Smith.*

Before the court in *Smith* was the validity of the Director's interpretation of D.C.Code §§ 36–308(2) & (3).[2] Importantly, we acknowledged that those provisions did not speak unambiguously to the issue before the court; rather, we discerned two "reasonable construction[s]" of the language bearing on the question whether a recipient of a schedule award could receive future temporary total disability benefits for the same injury. *Smith,* 548 A.2d at 98. Our decision upholding the Director's answer thus rested upon the principle that, "[w]here an administrative

agency is delegated broad authority to administer a statutory scheme, as here, we defer to a reasonable construction of the statute made by the agency." *Id.* at 97 (citations omitted).[3] Under this deferential standard, we reviewed the relevant statutory materials and concluded that the Director's interpretation—*i.e.,* "that once an employee reaches maximum medical improvement and receives a schedule award ... the employee is not entitled to temporary total disability benefits ... for future wage loss arising out of the same injury"—"is consistent with the Act's language, its legislative history, and the nature of its disability benefits scheme." *Id.* at 102. On that basis we affirmed the denial of temporary total disability benefits to Smith, who had received a schedule award for the injury in question. *Id.*

Given our standard of review in *Smith,* petitioner Cherrydale Heating is quite mistaken in asserting that "[t]he District of Columbia Court of Appeals['] decision [in *Smith* ] ... is binding on the agency" with regard to the availability of future temporary total disability benefits. The cases before us again required the Director to interpret the statutory language at issue in *Smith,* and in doing so she was free to consider whether the bar she identified in *Smith* nonetheless allowed an exception in either case consistent with the language and purpose of the statute. This court's task, by contrast, is the limited one of determining whether the Director recognized such an exception (in Poole's case) while reaffirming the general rule (in Evans' case), and whether those differing applications of the statute are reasonable.

The Director found *Smith* not controlling in Poole's case because

2. Those provisions state in relevant part:
   Compensation for disability shall be paid to the employee as follows: ...
   (2) In case of disability total in character but temporary in quality, 66⅔% of the employee's average weekly wages shall be paid to the employee during the continuance thereof;
   (3) In case of disability partial in character but permanent in quality, the compensation shall be 66⅔% of the employee's average weekly wages which shall be in addition to compensation for temporary total disability or temporary

partial disability paid in accordance with paragraph (2) or (4) of this subsection respectively, and shall be paid to the employee....
   D.C.Code §§ 36–308(2), (3) (1997).

3. That is true, we pointed out, "even if a petitioner advances another reasonable interpretation of the statute or if we might have been persuaded by the alternate interpretation had we been construing the statute in the first instance." 548 A.2d at 97 (citations omitted).

[t]he claimant in *Smith* suffered a mere flare-up of her injury, whereas in this case the claimant had to undergo surgery to amputate a further portion of his toe. . . . [T]he claimant, . . . after his surgery[,] would need some time to be once again at the stage of maximum medical improvement.

Cherrydale Heating argues that this represents an arbitrary departure from the *Smith* prohibition, because the Director relied on a factual distinction—"a mere flare-up of [the] injury" versus something worse—which the Director's interpretation in *Smith* ultimately made irrelevant. Specifically, although we noted in *Smith* that the claimant had experienced "a 'flare-up' of her permanent partial disability" and distinguished that from "a previously stabilized and compensated permanent partial condition which *deteriorates* . . . and results in further wage loss," 548 A.2d at 96, 101 n. 20 (emphasis in original), we explained that recourse for the latter would be

a modification of a *schedule award* based on changed circumstances. If [Smith's] condition deteriorates to the point where she can demonstrate a permanent partial disability in excess of [the previously determined] 5 percent, she would be statutorily entitled to an additional schedule award under D.C.Code § 36–308(3)(A). D.C.Code § 36–324. . . .

*Id.* at 101 n. 20 (emphasis added). That is to say, under the Director's reading of the statute, a "deterioration" rather than a "flare-up" of the previous condition still would not permit resumption of temporary total disability benefits, but instead a possible increase in the schedule award—something for which Poole, as Cherrydale Heating points out, has not applied.

The Director's reasoning in the Poole case is not crystal clear, but we think Cherrydale

Heating mistakenly reads it as equating Poole's change in condition with any form of "deterioration" (as distinct from "flare-up") justifying at most an increase in the previous schedule award. The hearing examiner framed the issue as "[w]hether [Poole's] need to undergo surgery *and amputation* constitutes a worsening of condition such that he is entitled to the resumption of temporary total disability benefits" (emphasis added). The Director, reiterating that Poole's surgery had been "to amputate a further portion of his toe," ruled that Poole "would need some time [thereafter] to be once again at the stage of maximum medical improvement," and thus was entitled to further temporary total disability benefits. The Director's decision is thus most naturally read as recognizing a narrow exception to the general rule for an extreme change of condition resulting in amputation or its functional equivalent. That reading both accords with a distinction recognized by other jurisdictions in this context, and explains the Director's refusal to award further temporary total disability benefits to Evans.[4]

Elsewhere it has been held that "[w]here an employee has suffered a schedule injury to some particular member or members and some *unusual and extraordinary condition develops therefrom* as a result . . ., which condition affects some other member or the body itself, an increased award is proper and should be made to cover . . . additional [temporary total] disability." *Scamperino v. Federal Envelope Co.*, 205 Neb. 508, 288 N.W.2d 477, 479, 480 (1980) (emphasis added). It is certainly reasonable to regard amputation as an extraordinary condition that "affects . . . the body itself"—that in effect causes *re-injury* to the body—in a way that lesser treatment including surgery does not. The distinction is recognized, for example, by the Pennsylvania workers' compensation statute:

4. At oral argument Cherrydale Heating's counsel asserted that Poole's surgery entailed a "further" amputation of a toe already partially amputated. Aside from the rather ambiguous phrase used by the Director (surgery "to amputate a further portion of his toe"), the record before us does not support this assertion. In its application for review to the Director, for example, Cherrydale Heating described the evidence as showing only that Poole had required "[e]x-

tensive medical treatment" for his original injury and that thereafter he had undergone "[s]urgery and amputation of a substantial part of [his] toe." No mention is made of an earlier amputation. Nonetheless, even if Poole had undergone successive amputations, the Director's determination that amputation *per se* creates an entitlement to further temporary total disability benefits would still be reasonable, for the reasons stated in the text.

(25) In addition to the [scheduled] payments hereinbefore provided for permanent injuries of the classes specified, any period of disability necessary and required as a healing period shall be compensated in accordance with the provisions of this subsection. . . .

\* \* \* \* \* \*

Where any such permanent injury or injuries shall require an amputation at any time after the end of the healing period hereinbefore provided, the employee shall be entitled to receive compensation for the second healing period . . . .

77 PA. STAT. § 513(25) (1998). In *Cywinski v. Workmen's Compensation Appeal Bd. (Acme Mkts., Inc.)*, 687 A.2d 1174 (Pa. Commw.1996), the court applied this distinction between subsequent ordinary surgical treatment and amputation by holding that removal of a "neuroma and nail remnant" from the tip of the employee's previously partially-amputated finger was not an amputation and so did not entitle him to the additional "healing period" benefits. *Id.* at 1175–76.

The Director could reasonably find this exception, which Pennsylvania has made explicit by statute, to be implicit in the District's allocation of disability benefits. Although generally the Act treats loss of a bodily member the same as "permanent total loss of use of a member," D.C.Code § 36–308(3)(R) (1997), both the trauma associated with amputation and the length of convalescence (and wage loss) presumed to accompany such intervention could fairly be seen by the Director to warrant a narrow exception to the conclusiveness of a schedule award for permanency.[5] As the Director pointed out, that limited departure from the prohibition recognized in *Smith* "serves the humanitarian purposes of the statute."

At the same time, the Director was not convinced that the deterioration in petitioner Evans' condition justified benefits outside the framework of the previous schedule award— which would include a possible increase in the percentage if warranted. Unlike Poole, who after amputation had little hope of returning to the level of his original maximum medical improvement, Evans underwent surgery in the expectation that this would return her to her former stabilized condition reflected in the schedule rating. In the words of *Smith*, Evans' need for surgery and attendant lost wages was foreseeable and within the "conclusively presumed . . . effect on future earnings potential" that a schedule award embodies, 548 A.2d at 101 (quoting in part 2 A. LARSON, WORKMEN'S COMPENSATION LAW § 58 .11, at 10–323–24 (1987)), while Poole's amputation could not similarly be anticipated. *Cf. Franke v. Fabcon, Inc.*, 509 N.W.2d 373, 377 (Minn.1993) (amended statute permits reopening of award only if "the change in condition was clearly not anticipated and could not reasonably have been anticipated at the time of the award"); *Stainless Specialty Mfg. Co. v. Industrial Comm'n*, 144 Ariz. 12, 695 P.2d 261, 267–68 (1985) (reopening for changed condition and need for treatment permissible where "the legitimacy of that need was not and could not have been adjudicated at the time of the last award"). The Director thus drew a reasonable distinction in coverage between the two situations.

Evans contends that reading *Smith* to bar further temporary total disability benefits for her worsened condition contravenes D.C.Code § 36–324(a), which allows modification of an award—without limitation on the type of benefits—"where there is reason to believe that a change of conditions has occurred." That general authorization to permit modification, however, must be read in tandem with the limitation recognized in *Smith*, or else that decision was wrong (something this panel may not decide) or rested upon an obscure distinction between a "flare-up" and a "deterioration" of a condition. That *Smith* ultimately made no such distinction is indicated by our earlier discussion: if a claimant's "condition deteriorates to the point where she can demonstrate a permanent partial disability in excess of" the previous percentage rating, we said in *Smith*,

---

5. As our role is to review the Director's interpretations of this statute for reasonableness, we express no view on a hypothetical future application that would treat some other change in condition as the equivalent of amputation.

"she would be statutorily entitled to an additional schedule award under D.C.Code § 36–308(3)," 548 A.2d at 101 n. 20, not temporary total disability benefits. The authority *Smith* cites directly for that point is D .C.Code § 36–324. *See id.*

Evans further argues that the Director's decision denying her benefits relied erroneously on her testimony that before stipulating to a permanency rating, she was aware through her physician that she might need eventual surgery (and so incur wage loss). Her mere subjective expectation, she says (and we agree), would not be a rational basis for denying her further temporary benefits. The Director did point out that Evans "entered into the stipulation, not blindly, but fully aware of her medical prognosis, *i.e.,* that her physical condition may deteriorate." But Evans reads too much into this language; we think it merely notes Evans' awareness of the *objective* nature of her injury as one that might later worsen and require surgery—and with respect to which the "fixed and arbitrary amount" of her schedule award was "an advance payment for future temporary total disability." *Smith,* 548 A.2d at 101. The Director denied Evans further temporary disability payments because in her judgment Evans' change of condition, unlike Poole's, warranted no departure from the statutory conclusiveness of the schedule award recognized in *Smith.* That determination was reasonable and must be sustained.

The decision of the Director in each case is, accordingly,

*Affirmed.*